## APPEAL OF HELVETIA MILK CONDENSING CO.

Docket No. 5306. Decided October 29, 1926.

The selling of goods with a protection clause against market declines does not result in an actual liability until there is a decline in the market; and, where payments or credits are made in adjustment of prices due to a decline in a subsequent taxable year, gross sales for the preceding year may not be reduced by the amount thereof.

*Hugh Satterlee, Esq.*, for the petitioner.
*John D. Foley, Esq.*, for the Commissioner.

The petitioner appeals from the determination of a deficiency in income and profits taxes for 1919 of $14,598.29. Allegations of error as to obsolescence and amortization were abandoned at the hearing, leaving as the sole question the proper treatment of payments and credits to jobbers in 1919 and 1920 in adjustment of sales made during the next preceding year.

### FINDINGS OF FACT.

The petitioner, an Illinois corporation, was organized in 1885, to engage in the business of producing evaporated milk, and has ever since engaged in such business.

The petitioner originated the process of preserving milk by evaporation and for many years was the only producer of this product. It lost this monopoly prior to 1900 and did not thereafter control the market price of its product. The market for the petitioner's

product was highly competitive for many years prior to 1918, as well as during 1918, 1919, and subsequent years.

For many years prior to 1918, as well as during and after 1918 and 1919, it was the universal practice of producers of evaporated milk, including the petitioner, to sell their product to jobbers at a price equal to the lowest producers' market price prevailing at any time after the sale to the jobbers and prior to the resale of such product by such jobbers. In pursuance of this practice such producers, including the petitioner, agreed to protect jobbers against declines in the producers' market price from the price at which they had been billed for goods in their hands; that is to say, when a decline in the producers' market price of say 50 cents per case occurred, each producer, including the petitioner, immediately requested each of his jobbers to submit an inventory of goods purchased from him still on hand and at once either paid or credited to the jobber 50 cents per case on all such goods which the jobber had on hand at the time the decline occurred.

During 1918 and 1919, as well as before and after those years, the petitioner sent circulars and general and special letters to the jobbers, soliciting purchases of evaporated milk and offering its goods for sale to them on the terms and conditions described in the preceding paragraph.

In all transactions for the sale of evaporated milk made during 1918 and 1919 by the petitioner with jobbers, as above stated, it was agreed by the petitioner and the jobbers (a) that the latter should pay to the petitioner, at the time of the sale to them, an amount equal to the producers' market price of the goods prevailing at the time of the sale, and (b) that the petitioner should protect the jobbers from a decline in the producers' market price of evaporated milk so sold and purchased during said year, upon such of said purchases as remained in the jobbers' hands at the time of the decline, by paying in cash or crediting to the jobbers, whenever the producers' market price was reduced, an amount equal to the difference between the amount invoiced by the petitioner to the jobbers at the time the goods were sold to them and the amount of the reduced producers' market price upon all said goods remaining unsold by and in the hands of the jobbers at the time of said reduction.

In accordance with such contracts of sale, each jobber to whom goods were sold by the petitioner during 1918 and 1919 was invoiced by the petitioner at the time of sale with an amount equal to the producers' market price of the goods pervailing at that time, subject to the petitioner's agreement to protect the jobber from a decline in the producers' market price of evaporated milk so sold and pur-

chased in 1918 and 1919, upon such of said purchases as remained in the jobbers' hands at the time of the decline, by paying in cash or crediting to the jobbers, whenever the producers' market price was reduced, an amount equal to the difference between the amount so invoiced by the petitioner to the jobbers at the time the goods were sold to them and the amount of the reduced producers' market price upon all said goods remaining unsold by and in the hands of the jobbers at the time of said reduction.

In 1919 and 1920 there occurred declines in the producers' market price of evaporated milk, and by reason thereof the petitioner, pursuant to its practice and agreement hereinabove described, repaid or credited to jobbers in 1919 the total sum of $42,023.40 in respect of 1918 sales, and in 1920 the total sum of $114,692.68 in respect of 1919 sales, these sums representing the difference between the amount invoiced by the petitioner to the jobbers at the time such goods were sold to them under such agreements in 1918 and 1919, respectively, and the lowest producers' market price prevailing during the period in each case commencing with the date of said sale to them and ending with the date of the resale of said goods by the jobbers. The petitioner unconditionally transferred the property in said goods to the jobbers in 1918 in pursuance of the contracts of sale entered into in that year, and in 1919 in pursuance of the contracts entered into in that year.

On or about March 14, 1919, the petitioner sent the following notice to its trade relative to protection against declines in the market price in the future.

All orders placed with this company after March 15, will be accepted with a limited protection against decline on stocks in jobbers hands as follows: In the event of our own decline we will rebate the jobbers only on stocks on hand which have been delivered to the jobber within fifty (50) days prior to the date of the decline, and in no event will the protection be given on more than one carload of a maximum of one thousand (1,000) cases.

We direct your attention to the enclosed letter of explanation on this subject. The rule above announced will be in effect until you are notified of change or modification.

The notice was accompanied by a letter relative to the petitioner's position before the Federal Trade Commission in the latter's investigation of the above-mentioned practice of guaranteeing prices against declines.

The price adjustments in 1920 of 1919 sales were accordingly limited to deliveries within fifty days prior to the date of the decline and to a maximum of 1,000 cases on the shelves of each jobber.

On February 7, 1920, the petitioner announced a price reduction of $1 per case. This decline was due to a reduction announced by a competitor on February 6th. The notice of the price reduction was as follows:

PRICE REDUCTION HELVETIA MILK CONDENSING CO.

HIGHLAND, ILL., *Feb. 7–1920.*

TO THE JOBBING TRADE:

We beg to announce that the following prices will go into effect at once:

Our Pet Brand Evaporated Milk

|  | BABY SIZE | TALL SIZE |
|---|---|---|
| Per case of_____ | 6 doz. cans | 4 doz. cans |
| In carload lots_____ | $3.90 | $5.75 |
| In less than carlots_____ | 3.95 | 5.80 |

F. O. B. your station.

TERMS: 30 days net or less 2 per cent in 10 days.

Quantities may be made up both sizes in order to obtain lowest price.

Please report all stock of Pet Milk on hand up to 1,000 cases from last car received within fifty days prior to date of this notice. (See Circular letter of March 14, 1919.)

Any Pet Milk received by you after Dec. 19, 1919, but billed prior to Dec. 19, 1919, invoice must be accompanied by expense bill showing date of arrival to entitle you to decline.

Thanking you for past favors we are

Respectfully yours,

HELVETIA MILK CONDENSING CO.

| BABY SIZE | TALL SIZE |
|---|---|
| 72 cans per case | 40 cans per case |

N. B.—Please render INVOICE covering DECLINE in price on STOCK ON HAND. We will remit for same. Please make no deductions for remittances.

The petitioner had no control over the producers' market price of evaporated milk at any time during 1919 and 1920. It produced during 1918 and 1919 from 12 to 15 per cent of the evaporated milk manufactured in the United States during those years. At the close of both 1918 and 1919 the market was highly competitive, both producers and jobbers then having large stocks on hand, and the season for greatest production being almost at hand. The petitioner knew at the close of both 1918 and 1919 that a drop in the market price of the goods was practically certain to come early in 1919 and in 1920, respectively.

The petitioner kept its books and accounts and made its returns for 1918 and 1919, as well as prior thereto and thereafter, upon the accrual basis.

The petitioner filed an amended income and profits-tax return for the calendar year 1919, wherein, for the purpose of determining taxable net income, the gross sales, less returns and allowances for 1919, were shown as $16,636,804.64, which amount excluded said sum of $114,692.68 paid to jobbers in 1920 in adjustment of 1919 sales, and from which there was not deducted said sum of $42,023.40 paid to jobbers in 1919 in adjustment of 1918 sales.

The Commissioner computed the petitioner's taxable net income for 1919, realized by it from sales of its product in 1919, without subtracting from the amount invoiced by the petitioner to the jobbers at the time of sale the sum which the petitioner paid in cash or credited to the jobbers in 1920 in respect of 1919 sales as aforesaid, to wit, $114,692.68, but deducting from the amount invoiced by the petitioner to the jobbers at the time of sale the sum which the petitioner paid in cash or credited to the jobbers in 1919 in respect of 1918 sales, to wit, $42,023.40.

OPINION.

Morris: The petitioner is seeking to reduce its gross sales for 1919 by the amount of certain credits or payments made to jobbers in 1920 in adjustment of 1919 sales. Goods were sold with a guarantee that price declines within fifty days on not more than 1,000 cases, as to stock still on hand, would be paid back or credited to purchasers in the amount of the decline. The question is as to the legal effect of the clause which protects the buyer from declines in the market price.

The petitioner contends that the basis for ascertaining profit from sales for 1919 is the contract price to which it was entitled and which it received, and such contract price was the lowest producers' market price prevailing prior to resale by the jobbers, and therefore the gross sales for 1919 should include only the difference between the original price and the amount of the credits and payments made thereon in 1920 due to the decline. The Commissioner contends that the amounts credited or refunded in 1920 on sales made in 1919 did not accrue as liabilities until 1920 and are therefore not deductible from the gross income of the earlier year.

The status of the petitioner on December 31, 1919, was that it had executed sales upon which refunds and credits would have to be made should there be a decline in the producers' market price within fifty days from date of delivery. Market prices were high, and, as subsequently developed, at their peak price. Petitioner was satisfied that declines would occur, but just when it was impossible to state. It did not control the market nor could it foresee what price reductions, if any, would be made by its competitors, which would necessitate a like reduction on its part. Nothing could be more uncertain than the fact that, within a limited period of time, an unknown amount might become due because of the happening of a contingency. If the price went up or remained constant the sale price stood; but if the producers' market price went down within the fifty days there was a corresponding reduction to the jobbers.

There is no doubt in our minds that, as of December 31, 1919, there was no actual liability on the part of petitioner to pay any determined or determinable amount. The liability was contingent. The contingency did not develop until February 7, 1920. As income is reported on an annual basis, there was no incurred liability on December 31, 1919, which could have been accrued.

Counsel for the petitioner has argued at length that the contingency here in question is as to profits and not as to losses. But with this contention we can not agree. At the time of the sale every act necessary to consummate the sale was done. The price was fixed subject to change only in one possible event. Counsel admits that a contingency exists but claims that the contingency exists only as to profits. The logic of the proposition seems to us to point entirely the other way. The sale was made at the market price, with a guarantee that the seller would stand for market declines within a limited period. Any liability of the petitioner in such cases is contingent upon the decline.

Suppose the petitioner had set up a reserve for such contingent liability: the decisions of the Board are uniformly to the effect that such reserves are not deductible, but that the deduction must be taken when the liability is satisfied. This question was dealt with in the *Appeal of William J. Ostheimer*, 1 B. T. A. 18, where the Board said (p. 21):

> The question remains as to whether the taxpayer in this case was entitled to accrue and take as a deduction in the respective periods included in this appeal a liability which it was known would arise when the leased property would be required to be returned to the lessor as good as when received. Since the taxpayer kept his books on the accrual basis, all deductions allowable in determining his net income should be on that basis, including his contractual obligation under the terms of the lease. In order that an item may be accrued, however, a liability must actually be incurred in the taxable year. *Schuster & Co.* v. *Williams*, 283 Fed. 115. The statute recognized the accrual basis of making returns by providing for the deduction of expenses *incurred* but not paid. It is apparent that no liability in praesenti was incurred under the terms of the lease in question in the years 1918 and 1919 however well known it might have been that a liability in some amount would be incurred at some time in the future. The liability to restore chattels as good as new or as good as when received when a lease is ultimately canceled or surrendered at some indefinite or indeterminate time in the future is not a present actual liability, and is not the actual incurring of an expense or liability.

See also *Appeal of Richmond Light & Railroad Co.*, 4 B. T. A. 91; *Appeal of Brighton Mills*, 1 B. T. A. 392; *Appeal of Pan-American Hide Co.*, 1 B. T. A. 1249; *Appeal of Uvalde Co.*, 1 B. T. A. 932; *Appeal of Morrison-Ricker Mfg. Co.*, 2 B. T. A. 1008; *Appeal of Thatcher Medicine Co.*, 3 B. T. A. 154; and *Appeal of Greenville Coal Co.*, 3 B. T. A. 1323.

In view of the foregoing, we are of the opinion that the gross sales for 1919 may not be reduced by the amount of credits and payments made to jobbers in 1920 on 1919 sales, and that the credits and payments made in 1919 on 1918 sales are a deduction from the 1919 gross income.

*Judgment will be entered for the Commissioner.*